AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Western District of Texas

FILED
2014 JUN 18  AM 9:39
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
         DEPUTY

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| Michael Todd Wolfe, aka "Faruq" | ) | A 14 M-288 |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __August 2013 through Present__ in the county of __Travis__ in the __Western__ District of __Texas__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 2339A | Attempt to Provide Material Support to Terrorists |

This criminal complaint is based on these facts:
See attached Affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent Blake Crow
Printed name and title

Sworn to before me and signed in my presence.

Date: 06/18/2014

_____
Judge's signature

City and state: Austin, Texas

Honorable Mark Lane, U.S. Magistrate Judge
Printed name and title

FILED

2014 JUN 18  AM 9: 39

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

-------------------------------------)
UNITED STATES OF AMERICA

vs.

MICHAEL TODD WOLFE, a/k/a, "Faruq."
-------------------------------------)

CRIMINAL NO. A-14-m-288

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Blake E Crow, Special Agent, Federal Bureau of Investigation, Austin, Texas, being duly sworn, depose and state the following:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed for nine years. I previously served approximately seven years as a commissioned officer in the United States Air Force. I am currently assigned to the San Antonio Division, Austin Resident Agency, working with the Central Texas Joint Terrorism Task Force (CTXJTTF). As part of my duties with the CTXJTTF, I am assigned to investigate counter terrorism matters in the Western District of Texas and elsewhere. I have held this assignment for approximately seven years. In preparation for this assignment, and as part of my continuing education, I have successfully completed approximately 450 hours of national security-focused training, to include formal courses, seminars, conferences and training exercises. I have also read and/or studied numerous publications related to historical and current terrorism topics authored by analysts, investigators, and, in some cases, actual members or supporters of designated Foreign Terrorist Organizations. I have participated in all aspects of counter

1

terrorism investigations, including but not limited to conducting surveillance, telephone and email analysis obtained as a result of subpoenas, subject interviews, witness interviews, and operations of confidential informants and undercover employees. Among other duties, I am currently involved in the investigation of Michael Todd Wolfe, aka, "Faruq," who resides in the Western District of Texas, Austin Division, area of responsibility.

2. I respectfully submit this affidavit in support of a criminal complaint and arrest warrant for Michael Todd Wolfe, a/k/a, "Faruq" ("Wolfe"). This affidavit is submitted for the purpose of establishing probable cause that beginning in approximately August 2013 and continuing through the present, in the Western District of Texas, Austin Division, Wolfe attempted to provide material support and resources to terrorists, including but not limited to personnel, including himself, knowing or intending that they be used in preparation for, or in carrying out, a crime of terrorism, including conspiracy to kill, kidnap, maim, or injure persons and damage property in a foreign country in violation of Title 18, United States Code, Section 956(a)(1) in violation of Title 18, United States Code, Section 2339A.

3. The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from various FBI agents, Task Force Officers, witnesses, reports, and other sources. This affidavit is intended merely to show that there is sufficient probable cause to support the requested arrest warrant. Accordingly, this affidavit does not purport to set forth all facts known to me or the FBI regarding this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Summaries of conversations do not include references to all topics covered in the communications. All verbatim quotations of verbal statements are

preliminary and in draft only. Verbatim quotations of written statements include original errors. All dates are approximate.

## THE DEFENDANT

4. Michael Todd Wolfe, a/k/a, "Faruq" (Wolfe) is a United States citizen born in Houston, Texas. He resides in the Western District of Texas.

## VIOLATION COMMITTED

5. Title 18, U.S.C. Section 2339A - Providing material support to terrorists, provides in pertinent part:

> (a) Offense. – Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . 956. . . or attempts or conspires to do such an act . . . shall be fined under this title, imprisoned not more than 15 years, or both, and if the death of any person results, shall be imprisoned for any term of years or for life.

Title 18 U.S.C. Section 956 provides, in pertinent part:

> (a)(1) Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

Title 18 U.S.C. Section 2339A(b)(1) provides, in pertinent part:

> The term "material support" or resources means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

## THE INVESTIGATION

7.      On or about August 8, 2013, an FBI employee operating in an undercover capacity (UCE #2) met Wolfe's wife, Jordan Nicole Furr, a/k/a Jordan Wolfe (hereinafter "Wolfe's wife"). Wolfe's wife revealed that she wanted to perform hijrah[1] and that, as part of her hijrah, she wanted to support her husband's goal of traveling to perform a violent form of jihad. UCE #2 asked if she and Wolfe were making plans for hijrah. Wolfe's wife advised that as soon as they had the money, they intended to go. UCE #2 then asked Wolfe's wife if she and Wolfe had a particular destination in mind. Wolfe's wife indicated they wanted to go to an area that wasn't too secular, where the Muslim population respects the sharia [Islamic Law]. She acknowledged most of the areas that upheld sharia had problems, but she indicated that her husband didn't mind so much, "because his heart yearns to like go be with his brothers . . . protect them and fight with them and everything." Wolfe's wife further stated that, "[h]e (Wolfe) just wants to hop into Syria. He's just ready to die for his deen [religion]. He's ready to die for someone; for something."

8.      On or about October 26, 2013, Wolfe told anther FBI employee acting in an undercover capacity (UCE#1) that he believed that violent jihad overseas was permissible.

9.      On or about November 1, 2013, while discussing the difficulty of traveling abroad for jihad, Wolfe stated that if he was single, he would already have left, but that he felt that he could not leave his wife here in the United States. UCE #1 revealed to Wolfe that UCE #1 occasionally helped individuals who wanted to travel for jihad in Somalia and Syria. Wolfe responded that he believed the hardest part was finding the right contact.

---

[1] Based on my training and experience, and after consultation with other experienced FBI investigators, your affiant believes that the term "hijrah" in this context can be defined as a religious migration to Muslim lands to seek freedom or sanctuary.

4

10. On or about December 6, 2013, Wolfe met with UCE #1. Wolfe revealed to UCE #1 that he had new eye glasses. Previously, on or about November 9, 2013, Wolfe advised UCE #1 that he needed a durable, thick pair of glasses with a head strap, noting that regular glasses wouldn't hold up on the battlefield, potentially causing him to inadvertently shoot a brother over there. Wolfe also expressed concerns about being stopped and questioned by law enforcement while traveling overseas.

11. On or about January 4, 2014, Wolfe and UCE #1 discussed their plans to cover or disguise the actual nature of their travel by referring to these plans as attending a musical concert in Europe. Wolfe advised that he had researched itineraries and the cost of plane tickets to several European cities. UCE #1 and Wolfe discussed the possibility of raising up to $1000 by selling Wolfe's firearms and UCE #1's pistol to finance their travel.

12. On or about January 10, 2014, in preparation for travel to conduct violent jihad overseas, Wolfe requested and paid the fee for certified copies of birth certificates for Wolfe and his two children.

13. On or about January 15, 2014, UCE #1 met with Wolfe. Wolfe advised that his wife was still good with Wolfe's plans to travel, but that she brought up several concerns, all of which revolved around who would take care of her and the kids once Wolfe left. Wolfe also discussed the possibility of expediting the passport applications.

14. On or about January 22, 2014, UCE #1 and UCE #2 met with Wolfe and his wife. Wolfe and his wife stated that they, along with their two children, had their passport photos taken earlier in the day. Wolfe indicated that he had learned that al Qaeda in Syria was training brothers from other countries (foreign fighters) and then sending those fighters back from Syria to their home countries to conduct terror attacks. Wolfe also explained that he and his wife had

been asking about certain things, such as what they would do to get a car or a job after they arrived in Turkey. Wolfe said he reminded his wife that they were not going over there to have a better work environment or pay cheaper rent.

15. On or about February 2, 2014, UCE #2 met with Wolfe and his wife. Wolfe had the group watch a YouTube video from the Light Revelation series titled "Syria: Stories of Conquest" regarding foreign fighters in Syria. While watching the video, Wolfe occasionally stopped the video to explain the current allegiances of the various groups fighting in Syria, including the Free Syrian Army, the Islamic Army of Iraq and As-Sham (Syria) (ISIS), Jabhat al-Nusrah and a group calling themselves Dawla[2]. Wolfe indicated that Allah put jihad in front of people to determine who the real men were. Wolfe also appeared excited about being part of the prophecy related to Syria[3] and later restated his intentions to go to Syria. Wolfe and his wife stated they would visit the Post Office the next morning to facilitate their passport applications.

16. On or about February 3, 2014, FBI agents observed and photographed Wolfe and his wife, along with a small child, entering the U.S. Post Office located in, Austin, Texas, where they applied for passports for themselves and their two children.

17. On or about March 17, 2014, Wolfe sent a text message to UCE #1 to advise that they (Wolfe, his wife, and the children) had received their passports.

18. On or about April 16, 2014, UCE #1 met with Wolfe. UCE #1 advised Wolfe he intended to leave Austin in two days and depart to Turkey within a week. UCE #1 also advised Wolfe that he intended to rendezvous with a group of brothers in Turkey on or about May 19,

---

[2] Based on my training and experience and after consultation with other experienced counterterrorism investigators and based on my review of the evidence in this case, your affiant believes that Wolfe's use of the word "Dawla" was likely a reference to ISIS which is translated into Arabic phonetically as Ad-Dawla Al-Islamiyyah fee Iraq wa As-Sham.
[3] Based on my training and experience and after consultation with other experienced counterterrorism investigators and based on my review of the evidence in this case, your affiant believes Wolfe was referring to Islamic apocalyptic scripture which describe significant fighting in Syria during the "End Times".

6

2014, and that, from there, he would prepare to cross into to Syria to commence training with the al Nusrah Front. UCE #1 and Wolfe then began discussing news reports of infighting occurring between al Qaeda affiliates, the al Nusrah Front and ISIS. As the conversation progressed, Wolfe referred to the al Qaeda representatives as "righteous brothers." Wolfe then stated that he and his wife were expecting a tax refund in the approximate amount of $5,000. Wolfe indicated that he believed his wife wanted to give a portion of the refund to her mother, and implied that the rest of the refund would be for their travel. Wolfe then claimed that he had researched airfare for all four of his family members to fly to Denmark via Iceland Air. Wolfe indicated that the cost would be approximately $1,500. UCE #1 and Wolfe agreed to use coded language when referring to the mujahedeen during future communications. Additionally, Wolfe indicated he'd recently obtained a "black shemagh," which he hoped could be shipped to him separately after he departed.[4]

19.   On or about April 17, 2014, the U.S. Internal Revenue Service advised the FBI that they had received the Wolfe family's 2013 income tax returns.

20.   On or about April 20, 2014, Wolfe contacted UCE #1 by telephone. Wolfe indicated he was trying to price everything out and inquired how they would travel from their first destination (Europe) to the "concert" – "concert" had previously been established as code between UCE #1 and Wolfe for violent jihad in Syria. UCE #1 advised Wolfe they would probably fly. Wolfe stated he was trying to earn some extra money by volunteering for a medical study. Wolfe also noted that it was considerably cheaper to fly to Europe first instead of trying to fly directly to where the "concert" would occur – meaning Turkey or Syria. Wolfe

---

[4] Based on my training and experience and after consultation with other experienced FBI investigators, your affiant has learned that a "shemagh" is a length of clothing which is wrapped around the head, traditionally worn by Middle Easterners to protect them from the sun. The shemagh has also been widely utilized by the mujahedeen, including those in al Qaeda and their various franchises, to conceal their identities during terrorist operations, the production of propaganda videos or periods of heightened media presence.

7

explained that he, his wife, and the children were planning on departing to Europe at the end of May 2014, but that those plans were dependent on the timely receipt of their tax refund.

21. On or about April 29, 2014, UCE #1 and UCE #2 talked *via* telephone with Wolfe and his wife to advise them of their scheduled departure to Turkey. Wolfe and his wife discussed their continued preparations for travel to Turkey, including researching airline tickets and visa requirements as well as getting their personal affairs in order. They also discussed plans for UCE #1 to meet them in Denmark to facilitate their entry into Turkey. In preparation for the "concert" – meaning jihad – Wolfe indicated he'd acquired a pair of hiking/running shoes. Wolfe also discussed his physical preparations for jihad to include martial arts, running and Cross-Fit. Wolfe advised that if he was interrogated he planned to say, "We're going to Copenhagen to go on a European tour." Wolfe believed they would have enough "plausible deniability" to refute any allegations they intended to travel to Turkey.

22. On or about May 2, 2014, UCE #2 called Wolfe's wife who confirmed that they had purchased their airline tickets to Denmark and were scheduled to depart from Houston, Texas on June 17, 2014.

23. On or about May 10, 2014, UCE #1 called Wolfe. They discussed the timing and method of future communications in relation to their anticipated travel date and rendezvous in Denmark. Wolfe expressed concern about his family's travel and the lack of regular communication with UCE #1. Wolfe and UCE #1 agreed to speak approximately every three days. Wolfe explained that his wife's concerns about the details of their impending travel were causing tension. Wolfe and UCE #1 discussed how Wolfe would obtain a visa to enter Turkey, and UCE #1, citing security concerns, suggested that Wolfe should apply for his visa after he arrived in Denmark. Wolfe appeared to maintain his current plans to travel with his family.

8

24.     On or about May 19, 2014, UCE#1 called Wolfe. Wolfe utilized coded language as he expressed concerns about traveling to join Jabhat al-Nusra based on information he'd learned about the group's recent activities. Wolfe indicated he was more in line with another group[5]. Wolfe stated that he had been researching the situation in Syria and he had seen the two groups make statements against each other. Wolfe indicated he still wanted to go for jihad, but did not want get caught in the in-fighting between the two groups, which had nothing to do with his agenda.

25.     On or about May 23, 2014, UCE #1 called Wolfe. UCE#1 advised Wolfe that Wolfe had to decide for himself and his family about whether to travel and that "we are not going for a holiday." Wolfe stated, "It's not that I don't want to go, I just need to figure out the best situation." Wolfe discussed how his life seemed better than it was before, yet, "I would much rather leave than sit…I'm getting too comfortable sitting here." UCE#1 shared Wolfe's concerns about the infighting occurring between the two groups and indicated he would have an opportunity to determine if the members of Jabhat al-Nusra shared his beliefs. Wolfe opined that Jabhat al-Nusra would not simply let them leave and go to another group. Wolfe acknowledged that he had to make a final decision soon, otherwise he couldn't get his tickets refunded. Wolfe discussed the option of either waiting or moving closer to the conflict, thus making the conflict more available. Wolfe stated that the worst feeling would be to sit on the couch watching the "concert," wishing he was there. Wolfe indicated he would advise UCE#1 of his decision within a couple of days.

26.     On or about May 30, 2014, UCE #1 called Wolfe. Wolfe inquired how far in advance UCE#1 would travel to Denmark to meet them on June 17, 2014. Wolfe also asked

---

[5] Based on the investigation to date, your affiant believes the other group referred to by Wolfe is the Islamic State of Iraq in Syria (ISIS).

9

UCE#1 for the address where they would stay. Using coded references, the two discussed the terrorist groups operating in Syria for some time. According to Wolfe, one of the brothers he was talking with had lots of information about "concerts" and he described one of the groups as being more accepting to outsiders. UCE#1 reaffirmed that there were lots of "concerts" in the area. UCE#1 advised Wolfe they would not stay in Denmark for long, as they would be going to the "concert" around the time of Ramadan[6]. Wolfe expressed an interest in "sticking together" after he and UCE#1 arrive at the concert. UCE #1 stated that the other person[7] traveling with them already had the respect of the brothers because he had referrals and recommendations. Wolfe explained that, given the demographics of their group, it would make sense to go to the other "performance[8]," as they wouldn't feel so out of place. Wolfe indicated he had struggled with whether to stay or go, and stated, "...but now...I'm back to going, so I'm kinda like scrambling..." with respect to financial issues.

27. On or about June 6, 2014, UCE #1 called Wolfe. As they continued to speak in coded language, UCE#1 confirmed that some of the other groups fighting in the vicinity of Syria would be more accommodating than Jabhat al-Nusra. UCE #1 asked Wolfe whether he could get a yellow fever vaccination since they would be working with foreign fighters in Syria who might have previously been exposed to yellow fever. Wolfe told UCE #1 that he had purchased luggage and discussed how much it would cost to check it at the airport. Wolfe stated that everything, other than money, was sorted out for the trip. Wolfe stated said he wanted to just focus on saving enough money to last a month or so.

---

[6] According to open sources, Ramadan 2014 spans the timeframe June 28, 2014 – July 28, 2014.
[7] The person UCE#1 referred to is an FBI human source who was previously introduced to Wolfe as a jihadist whom UCE#1 assisted in traveling overseas for the purpose of participating in violent jihad.
[8] Based on the investigation to date, your affiant believes that Wolfe's discussion of the other "performance" was a reference to the Islamic State of Iraq in Syria (ISIS).

28. On or about June 13, 2014, UCE #1, UCE #2, Wolfe and Wolfe's wife spoke again. UCE #1 and UCE #2 discussed their impending departure to Denmark, where they were ultimately to meet with Wolfe and his family. UCE #1 explained that they were leaving Turkey for Denmark and were going to the airport in approximately an hour. Wolfe asked for details about where they would be staying in Denmark and UCE #1 explained that Wolfe would be provided those details after UCE #1 arrived in Denmark. Wolfe discussed sending a package to himself in Turkey and UCE#1 gave Wolfe an address in Turkey to which the package could be sent. Wolfe's wife agreed to send their itinerary to UCE #2.

29. On or about June 17, 2014, FBI surveillance observed Wolfe and his family enter the George Bush Intercontinental Airport, located in Houston, Texas. Wolfe was arrested on June 17, 2014, as he attempted to board flight #8112 to Toronto, Canada. Wolfe's ticketed itinerary had him traveling through Iceland and arriving in Copenhagen, Denmark on June 18, 2014, where he had arranged to meet with UCE #1. Based upon the investigation as well as recorded conversations with UCE#1, your affiant believes that Wolfe intended to ultimately travel to Syria through Turkey, and engage in violent jihad.

## CONCLUSION

Based on the above, I submit there is probable cause to believe that Wolfe has attempted to provide material support and resources to terrorists, including but not limited to personnel, including himself, knowing or intending that they be used in preparation for, or in carrying out, a crime of terrorism, including conspiracy to kill, kidnap, maim, or injure persons and damage property in a foreign country in violation of Title 18, United States Code, Section 956(a)(1), in violation of 18 U.S.C. Section 2339A.

Dated: 06/18/14

_____
Special Agent Blake Crow
Federal Bureau of Investigation

Sworn to before me this 18th day of JUNE, 2014.

_____
Honorable Mark Lane
United States Magistrate Judge